UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION


JAMES ROSKIND,             ) CASE NO:  2:05-CV-825-RCJ-RJJ
                     )
        Plaintiff,    )      CIVIL
                     )
  vs.               )    Las Vegas, Nevada
                     )
AARON EMIGH, ET AL.,    )  Wednesday, June 11, 2008
                     ) (10:07 a.m. to 11:14 a.m.)
        Defendant.   )


** PARTIAL TRANSCRIPT **
(PORTION OF HEARING FROM 10:07 to 11:14 a.m.)


JURY TRIAL


BEFORE THE HONORABLE ROBERT C. JONES,
UNITED STATES DISTRICT JUDGE


Appearances:         See next page

Court Recorder:      Denise Saavedra

Courtroom Administrator: K. Goetsch

Transcribed by:      Exceptional Reporting Services, Inc.
                  14493 S. Padre Island Drive
                  Suite A-400
                  Corpus Christi, TX 78418-5940
                  361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiff:          RODNEY JEAN, ESQ
                        GREGORY GEMIGNANI, ESQ
                        Lionel Sawyer & Collins
                        300 S. Fourth Street, Suite 1700
                        Las Vegas, NV 89101

For Defendant:          BRAD JOHNSTON, ESQ
                        Hale Lane Peek, et al.
                        5441 Kietzke Lane
                        Suite 200
                        Reno, NV 89511

Court Recorder:         Denise Saavedra

1          **Las Vegas, Nevada; Wednesday, June 11, 2008; 10:07 a.m.**

2            **(Entire proceeding recorded; partially transcribed)**

3          **(Transcription beginning at 10:07 a.m.; hearing in progress)**

4                  **THE COURT:**  I'm sorry to interrupt counsel, but I

5     have a couple of questions.

6                  On these that are labeled PA, sir, were you the

7     person that's responsible for the invention contained in those

8     patent applications?

9                  **THE WITNESS:**  Not necessarily.  The inventions were -

10    - you know came out of collaborative discussions between the

11    two of us.  The A or J or so on is who drafted the patent

12    application.  The invention -- the inventions were all

13    collaborative to some degree.  Where there's a primary inventor

14    of the invention that person would be listed first in the list

15    of inventors.

16                 **THE COURT:**  So wherever it's PA, you're the primary

17    inventor?

18                 **THE WITNESS:**  Wherever it's PA, I'm the primary

19    author of the application.

20                 **THE COURT:**  And are you the primary inventor?

21                 **THE WITNESS:**  Not necessarily.  Although that is

22    generally the case, because we tended to pick the inventions

23    that we were -- that we had primarily created or endorsed for

24    the work that we chose to do.

25                 **THE COURT:**  So for all of these labeled PA, generally

1    you're the primary inventor?

2             **THE WITNESS:**  Generally, but not necessarily.

3             **THE COURT:**  Also, sir, when it came time that the

4    entity needed additional funds why is it that Mr. Roskind

5    loaned the funds, and you didn't share in the loaning of funds?

6             **THE WITNESS:**  Well, there's an interesting story to

7    that in that it wasn't actually when the entity needed the

8    additional funds that they were loaned.  What happened there is

9    there was a discussion that Jim and I had in Redwood City, and

10   it was approximately a year into our partnership, I think.

11            And Jim said, "You know, I have to say this is going

12   amazingly well.  And I'm incredibly impressed with the nature

13   of your work.  And also you're putting in such an amazing

14   amount of time.  I feel a little bit bad, because I'm not

15   putting in the same kind of time that you are.  And I don't

16   want to."

17            When we had discussed the partnership initially we'd

18   said let's start 50/50.  And then if things are really

19   imbalanced one way or the other, then we'll renegotiate.  We

20   were old friends; so it seemed that would be easy to do.

21            And Jim said, "You know, something I'd like to do to

22   kind of offset the imbalance is to put in some -- to loan some

23   money to Radix.  I believe it's going to be extremely valuable.

24   So I believe it will be a good investment or a safe investment

25   to loan Radix some funds against its IP profits."

1          And that would be to pay for somebody to join Radix

2   and perform specifically IP prosecution work to allow Jim and

3   me to focus more on the creation of the intellectual property

4   and to create more intellectual property, you know, basically

5   increase the number of inventions.

6          **THE COURT:**  It wasn't because you didn't have funds

7   to share in the contribution or in the loan?

8          **THE WITNESS:**  No, it was not.

9          **THE COURT:**  And why do you think that Mr. Roskind is

10  not a managing director, sir?

11         **THE WITNESS:**  Because I believe he's withdrawn from

12  the company.

13         **THE COURT:**  All right.  I really think I've heard

14  enough, counsel.

15         I'm really ready to render judgment in this case.

16         You know, your client has in the short testimony that

17  you've already elicited you've convinced me that your client --

18  he's not prevaricating, but he's a narcissist.

19         He has no ability to perceive that he has an

20  obligation to share in the management of this entity.  And he

21  thinks that everything he's done is just absolutely correct.

22  And the short testimony you've given absolutely persuades me of

23  that.

24         I think I'm ready to render judgment.  I'm going to

25  take a brief recess and let you --

1          **MR. JOHNSTON:**  Your Honor, if I may, I need --

2          **THE COURT:**  -- prepare yourself.

3          **MR. JOHNSTON:**  Can I make a statement on the record?

4          **THE COURT:**  You sure can.

5          **MR. JOHNSTON:**  I don't --

6          **THE COURT:**  The main issue, of course, the only issue

7     that would contravene such a finding is that there was some

8     kind of an agreement in fact reached for which, of course,

9     there's absolutely no evidence so far on the record that Mr.

10    Roskind had forfeited his interest or was obligated to turn his

11    interest into a beneficial interest only, which is just an

12    absolutely ridiculous position.

13         **MR. JOHNSTON:**  Well, your Honor, I think the evidence

14    will show that the parties absolutely reached an agreement.

15         **THE COURT:**  They reached an agreement?

16         **MR. JOHNSTON:**  On a seven-year vesting schedule.

17         **THE COURT:**  Right.  As evidenced by this lawyer's

18    agreement?

19         **MR. JOHNSTON:**  As evidenced by the discussions

20    between the parties.

21         **THE COURT:**  Which both sides agreed would be torn up

22    and would not be used.

23         **MR. JOHNSTON:**  Not used to -- not handed over to

24    another lawyer to take a draft of.  I --

25         **THE COURT:**  Okay.  I'm going to give you five minutes

1    to prepare yourself to make any concluding statement you have.

2    But I think I've heard enough.

3              **MR. JOHNSTON:**  Your Honor, I

4              **THE COURT:**  The testimony and the position taken in

5    defense of this lawsuit is frivolous and borders on frivolous.

6              **MR. JOHNSTON:**  Your Honor --

7              **THE COURT:**  So I'm going to give you a few minutes to

8    prepare your statement.  Then I'm going to render judgment.

9    Thank you.

10             **THE CLERK:**  All rise.

11         **(Recess taken from 10:12 a.m. to 10:20 a.m.; case recalled**

12    **at 10:20 a.m.)**

13             **THE COURT:**  Thank you.  Please be seated.

14             It's obviously clear to me that this case should've

15    been resolved long ago by settlement or by summary judgment,

16    that there's a clear disagreement on the right to manage and

17    make decisions relative to all of the critical functions that

18    this entity needs to carry out in order to complete reasonably

19    its business.  That's just so obvious to me, I can't understand

20    why this case has proceeded this far.

21             There's an absolute disagreement on who has the right

22    to make the decisions.  There shouldn't be.  It's a 50/50

23    entity.  And there's absolute disagreement on the course to

24    prosecute, on the course to market, on the course of

25    management, on even the simple thing of payment of expenses, on

8

```
 1   when loans would be repaid.  In every area that would be

 2   necessary for this business to be carried out in a reasonable

 3   form and function, there's disagreement between the two parties

 4   who have 50/50 say.

 5           It's just beyond me why we're still here arguing

 6   about it.

 7           MR. JOHNSTON:  Your Honor, may I respond?

 8           THE COURT:  And include in your statement please and

 9   in your response any offer of proof that you would've intended

10   to put on before I cut you off.

11           MR. JOHNSTON:  Yes, your Honor.

12           First of all, the Court made the comment that this

13   defense was frivolous.  And I take that statement obviously

14   very seriously as an attorney practicing before this Court and

15   in the state of Nevada.  I assure you that, one, the parties

16   did participate in a mediation with a third-party mediator --

17           THE COURT:  Good.

18           MR. JOHNSTON:  -- trying to resolve this.  It was

19   unsuccessful.

20           And I don't think it's appropriate for me to put on

21   the record as to everything that went back and forth, but there

22   were proposals exchanged.  And the parties could not reach an

23   agreement.  And one of the key reasons why is one of the issues

24   in this case.  How do you divvy up these assets?  How do you do

25   that --
```

1          **THE COURT:**  Well, I can tell you how we do it.  We

2     sell them.

3          **MR. JOHNSTON:**  I understand that, and I don't even

4     know how you sell them.

5          **THE COURT:**  I can tell you how we do that too.

6          **MR. JOHNSTON:**  I guess we retain an investment

7     banking firm to market it.  I mean there are procedures.  But

8     neither party was interested in that.  The first time we heard

9     of public sale was during Mr. Jean's opening statement in this

10    courtroom.

11         As far as levying the defense part of the defense is,

12    one, we believe the evidence does show that the company has

13    continued to operate despite these disagreements and that these

14    disagreements only arose as Mr. Emigh would testify after Mr.

15    Roskind told him he --

16         **THE COURT:**  Mr. Johnston, that view is a narcissistic

17    view.  It's continued to operate only in accord with the

18    control and management and in the direction that your client

19    wants it to go.  He's the one who's deciding we'll prosecute

20    this.  We won't prosecute that.  We'll retain this attorney.

21    We won't retain that attorney.  We'll -- I'll do the effort,

22    and I'll claim the credit.  You won't.

23         How can you say other than in a narcissistic way that

24    all of the functions of this company have continued to be

25    carried on?  Do you understand why I'm saying that's a

1    frivolous defense?

2              **MR. JOHNSTON:**  Well, with all due respect, your

3    Honor, the evidence would show that Mr. Roskind did not want to

4    continue with what the parties' agreement was.

5              **THE COURT:**  And, therefore, he forfeited his voting

6    right and management right?

7              **MR. JOHNSTON:**  Well, when he files for dissolution

8    and seeks to dissolve the company and when he's forcing a hand

9    -- I mean, your Honor, the --

10              **THE COURT:**  Counsel, you had no signed operating

11    agreement.

12              **MR. JOHNSTON:**  Understood.  And the evidence --

13              **THE COURT:**  The only way that you could present it is

14    to say that there was an oral agreement.  The only way that you

15    could say there was an oral agreement is we reached agreement

16    and put on in spite of the statute of frauds or whatever else

17    might be applicable to bar that kind of proof to say here's the

18    proof.  Here was the conversation.  Here were the witnesses to

19    it.  We reached agreement.

20              **MR. JOHNSTON:**  Well --

21              **THE COURT:**  We didn't have an agreement that we would

22    review and sign, an operating agreement.  We reached agreement.

23    We agreed we don't need an operating agreement.  Here's the

24    agreement, seven-years vesting.

25              Because all the evidence so far is to exactly the

1  contrary.  They agreed there would be an operating agreement.

2  And the one that you suggested in evidence here, which of

3  course I allowed to come in over Mr. Jean's objection, probably

4  I shouldn't have, and over certainly what would be an objection

5  by the attorney who drafted it.

6         Your only evidence here is an operating agreement

7  that was expressly rejected and rejected by your client and

8  which both sides agreed would not even be used.

9         **MR. JOHNSTON:**  I understand that, your Honor.

10        **THE COURT:**  How is your defense anything but

11  frivolous on that issue?

12        **MR. JOHNSTON:**  Because, your Honor, we're not saying

13  there is a total operating agreement.  What we were saying is

14  there was an agreement as to this seven-year vesting schedule.

15  That's evidenced by, one, Mr. Roskind's own testimony that he

16  discussed that with Mr. Emigh.  It would be bolstered by the

17  testimony of Mr. Emigh that that was in fact the parties'

18  agreement.

19        Then you have an effort to embody that in a written

20  agreement.  There is nothing that says an agreement on a

21  vesting schedule would have to be in writing or part of an

22  operating agreement.  In addition, we located authority out of

23  the Delaware Chancery Court where they actually looked at a

24  draft operating agreement and said that might be embodying the

25  parties' agreement on certain issues with respect to this

1    company.

2            But, in addition, the defense in this case is not

3    just on whether or not dissolution was warranted.  There were

4    two parts to what we were saying.  It also is if the Court

5    finds that dissolution is warranted then there is also as cited

6    by -- the case cited by the plaintiff, cited by -- the cases by

7    us.  It becomes a discretion for the Court as to what to do.

8    Do you dissolve it?  Do you fashion some other remedy?

9            So one of the issues I thought would be in this trial

10   was if the Court granted dissolution what would the remedy be.

11   I thought that was going to be an issue in this trial, because

12   the Court denied Mr. Jean's --

13           **THE COURT:**  It is an issue, and that's where really

14   the parties all this time should've been focusing their effort.

15           **MR. JOHNSTON:**  And I tried to focus on that with Mr.

16   Roskind in terms of how do you divide those.  And I got the

17   impression the Court didn't want to hear evidence on that

18   issue.  So --

19           **THE COURT:**  No.  That's really input by counsel.

20           **MR. JOHNSTON:**  Well, I would believe there needs to

21   be an evidentiary record.

22           **THE COURT:**  If that was your -- no, I don't think so.

23           In other words, I'm constrained both by the statute

24   and, of course, any equitable remedies that are permitted under

25   the law of equity.  And obviously that has input by you.

1    Nobody has any witnesses here to say how's the best way to sell

2    this intellectual property or whether to divide it up.  None of

3    you presented expert testimony on that.

4         **MR. JOHNSTON:**  Which I think is a flaw in the

5    plaintiff's case is they're coming in asking for distribution

6    of assets, and they don't offer into evidence as part of their

7    case in chief how to do it.

8         **THE COURT:**  Okay.

9         **MR. JOHNSTON:**  They fail as a matter of law on their

10   second aspect of their case, which is presenting this Court

11   with evidence as to how to complete the remedy they're asking.

12        **THE COURT:**  Okay.  Let's get to the crux issue.  I'm

13   going to render judgment now that there is a right --

14        **MR. JOHNSTON:**  Your Honor --

15        **THE COURT:**  -- to dissolution.

16        Your offer of proof is inadequate.  There is

17   absolutely nothing in this record nor in your offer of proof

18   that would suggest there was any agreement reached.  There

19   certainly was discussion made.  But that an offer, an

20   agreement, or a contract for a vesting schedule with a

21   forfeiture attended to it, there is nothing in this record nor

22   in the offer of proof that would support such a claim.

23        Presentations of such a defense I state here on the

24   record in my conclusion is frivolous.  Let's get to the --

25        **MR. JOHNSTON:**  Your honor, may I --

1          **THE COURT:**  -- critical issue of how to divide the

2    pot.

3          **MR. JOHNSTON:**  May I make a statement on the record?

4          **THE COURT:**  Uh-huh.  For the Appellate Court, go

5    right ahead.

6          **MR. JOHNSTON:**  For purposes.

7          One, I do not believe I've been given an adequate

8    opportunity to complete the offer of proof.  Second, I think to

9    have the Court interrupt, with all due respect to your Honor,

10   interrupt after 45 minutes of examination of the defendant

11   after the plaintiff testified for approximately a day and a

12   half is an abuse of discretion, to not even let the defendant

13   tell his side of the story.

14         I've not been given the opportunity to complete the

15   offer of proof.  The notion -- I understand the Court's view

16   that the dissolution is warranted, but to characterize the

17   defense of this action as frivolous when there is the separate

18   issue of, well, what do we do next.  And the notion that we

19   came in to try this case after trying to resolve it through

20   third-party mediation is frivolous, I believe that is just

21   inaccurate and not warranted by the evidence and the efforts

22   undertaken.

23         All of --

24         **THE COURT:**  Okay.  I think I should let you complete

25   your offer of proof.  My conclusion with respect to the

1   frivolous defense had reference -- so it's clear on the record

2   -- had reference to your defense that Mr. Roskind had forfeited

3   his right as a managing director of the company by his request

4   for dissolution.

5           **MR. JOHNSTON:**  That --

6           **THE COURT:**  And the defense that there is an

7   agreement that causes that forfeiture.  That's what's

8   frivolous.

9           So let me make you -- let me allow you to make an

10  offer of proof and complete your record in that regard.

11          **MR. JOHNSTON:**  Thank you, your Honor.

12          First of all, we believe the evidence would show that

13  it was in fact an agreement and understanding between Mr. Emigh

14  and Mr. Roskind that there was the seven-year vesting schedule.

15  And that if one party wanted out of the company, he could

16  accept a beneficial interest in the company based upon that

17  vesting schedule.

18          Mr. Emigh would have testified, if permitted to do

19  so, that during the conversations at the Café Veronie

20  (phonetic), which even Mr. Roskind claims occurred, Mr. Roskind

21  indicated that he no longer wanted to continue with Radix Labs

22  due to family considerations and other considerations in terms

23  of time and where he was at in the process of the company.

24          **THE COURT:**  To be explicit, he didn't just want it

25  dissolved.  He wanted out and for Radix to continue under the

1    management of Mr. Emigh?

2         **MR. JOHNSTON:** Well, he did not mention dissolution

3    at that point in time. Mr. Emigh then said, "Well, we have the

4    seven-year vesting schedule that we agreed upon." Mr. Emigh

5    would testify that Mr. Roskind said, "Well, I'd like to look at

6    an alternative arrangement to that," that he didn't disavow

7    that they had agreed upon the seven-year vesting schedule.

8         And that in the course of the discussions and

9    subsequent discussions they talked about different ways to part

10   ways divvying up the assets in kind in some agreeable manner,

11   for Mr. Emigh to buy out Mr. Roskind out of the company, and

12   that there was potentially a remedy where you could give

13   control of certain intellectual property to each of the members

14   and that the other would have some sort of interest in the

15   portfolio assigned to the other to get any potential economic

16   upside.

17        The parties were not able to agree on a solution.

18   And Mr. Roskind at that point said, "Well, I'll just dissolve

19   the company." It was after that happened that the disputes

20   began to arose that led to the filing of this lawsuit and which

21   Mr. Roskind testified. Mr. Emigh would testify that prior to

22   the conversation at the Café Veronie there was no disruption.

23   There was no disputes.

24        The best -- he would testify that at about the same

25   time as that conversation at the Café Veronie was the complaint

1    about who was listed as the first inventor.  Furthermore, the

2    position that Mr. Emigh said was "I don't believe he's a

3    managing member anymore, because I believe he's withdrawn,"

4    that's not the way -- he still has communicated with Mr.

5    Roskind.  He's not denied the loans that Mr. Roskind is owed.

6    He has not denied that he's entitled to be repaid his expenses.

7    These positions are not taken.

8            What the position of the defendant is these parties

9    operated informally.  Exhibit 17, there's an e-mail regarding

10   the loans.  You know there's no real formal assignment of the

11   loan from Radix Partners to Radix.  And Mr. Emigh just

12   testified I don't disavow that Mr. Roskind's owed the $40,000.

13   What the position of the defendant is these parties had

14   informal agreements, oral agreements and understandings, as to

15   how expenses would be paid, the consulting fees passed through.

16           And Mr. Roskind wants to pick and choose which of

17   those agreements including the vesting schedule that they

18   agreed upon.  And that vesting schedule would normally be

19   embodied in an operating agreement, but it wouldn't have to be

20   embodied in an operating agreement.

21           **THE COURT:**  It would normally in any layman sense be

22   embodied in a written document.

23           **MR. JOHNSTON:**  And they --

24           **THE COURT:**  You know, an agreement about the loans --

25   I agree this business was informal.  An agreement about the

1    loans, okay, I buy that.

2           **MR. JOHNSTON:**  Assignment of the intellectual

3    property --

4           **THE COURT:**  An understanding about who would be

5    listed as first investor -- inventor, yes, I understand that.

6    An agreement from time to time about types of expenses that

7    would be reimbursed, that's right.

8           But a forfeiture -- what really is a forfeiture

9    provision, "When you withdraw, your interest is no longer

10   voting.  Your interest is no longer director.  You only have a

11   beneficial interest.  You just take what I give you."

12          Don't you think any layman would normally think that

13   would be in writing?

14          **MR. JOHNSTON:**  I think everything would be in writing

15   that you just talked about, your Honor.  I think clearing up

16   that the inventors, Mr. Roskind and Mr. Emigh, were assigning

17   this intellectual property to their companies would be in

18   writing.  That Radix Labs was a continuation of Radix Partners

19   would be in writing.

20          **THE COURT:**  So what reasonable jury, what reasonable

21   jurist, did you expect to buy the concept that even though

22   there was an operating agreement that embodied the seven-year

23   vesting contemplated and even though one was never finally

24   drafted nor signed, what reasonable jurist did you expect to

25   accept the testimony or argument that these two orally agreed

1    to it?

2              **MR. JOHNSTON:**  Well, there is documents that show

3    they agreed to it.  There is testimony even from Mr. Roskind

4    that they agreed to the seven-year vesting schedule.  I

5    elicited that at his deposition.  Therefore, I have Mr.

6    Emigh --

7              **THE COURT:**  I've got all of that testimony.  You

8    elicited nothing that he agreed.  He discussed, yes.  He gave

9    those provisions to the attorney, yes.

10             **MR. JOHNSTON:**  He testified that prior to going to

11   the attorney he agreed upon the framework of a seven-year

12   vesting schedule with Mr. Emigh.  And that's why they --

13             **THE COURT:**  He agreed on the framework?  They

14   discussed the framework.  But we're using -- you understand

15   that I'm using the concept agreed in the technical, legal

16   sense.

17             **MR. JOHNSTON:**  Absolutely.

18             **THE COURT:**  We reached an enforceable agreement.

19             **MR. JOHNSTON:**  And I believe a rational trier of fact

20   viewing this evidence in the light most favorable to Mr.

21   Emigh --

22             **THE COURT:**  Obviously not me.  But you believe a

23   rational trier of fact --

24             **MR. JOHNSTON:**  Absolutely could say that these two

25   parties given their informalities certainly agreed upon that

```
 1   seven-year vesting schedule and then went forward --

 2           THE COURT:   And knew they didn't need an operating

 3   agreement.   They had already reached that agreement.

 4           MR. JOHNSTON:   They reached the agreement on that

 5   point.   And Mr. Emigh will testify that the operating agreement

 6   was needed because they were bringing in Chin Wong (phonetic)

 7   who was also going to get a beneficial interest in the company.

 8           THE COURT:   I hope that's a complete explication to

 9   the Appellate Court.   I don't think any reasonable jurist could

10   accept such a defense in this case.

11           MR. JOHNSTON:   I understand.   But I want to -- if I

12   could complete just one more point.

13           THE COURT:   Uh-huh.

14           MR. JOHNSTON:   That the purpose of the operating

15   agreement was another issue.   Keep in mind that the operating

16   agreement was being drafted for Radix Labs.   And the reason

17   that was going is they were bringing Chin Wong in to work for

18   the company who was going to take a beneficial interest.   They,

19   therefore, needed to complete their management documents.

20           When Chin Wong departed from the company and was

21   paid, they no longer needed the documents to embody that

22   agreement.   So it fell by the wayside.   They continued to

23   operate informally.

24           Under those circumstances and that explanation -- I

25   understand the Court's view.   I think a rational trier of fact
```

21

1    -- but, in addition, the defense is not just limited to that.

2    Some of these disputes are trivial.  I mean Mr. Emigh calling

3    himself president.  He would testify that, "Well, his

4    understanding was that Mr. Roskind did as well."  That's not

5    creating deadlock.  That's a trivial dispute.

6          The other trivial dispute, who's listed first.  Mr.

7    Emigh sent an e-mail saying, "I'll list it however you say."  I

8    can understand there was a lot of back and forth between these

9    parties.  But the one key issue that brought the real heated

10   exchange and accusations was when Mr. Emigh paid himself the

11   consulting fees out of the Anicam (phonetic) consulting work.

12   And that was absolutely consistent with how consulting fees had

13   been treated previously.

14         **THE COURT:**  It sure wasn't consistent with two lines

15   on the check blank.

16         **MR. JOHNSTON:**  No.  But Mr. Roskind even admitted in

17   his response to the request for admissions that that was the

18   accurate numbers of payment in respect to the work performed.

19         **THE COURT:**  But he didn't approve, and he would not

20   sign the check.

21         **MR. JOHNSTON:**  Understood.  Because he was

22   backtracking from the agreement they reached.

23         **THE COURT:**  And he believed that the informal

24   agreement of the parties was no disbursement could be made if

25   he didn't approve.

1    **MR. JOHNSTON:**  But, your Honor, when you characterize

2  my client as narcissistic that argument can be made just as

3  much to Mr. Roskind.  "It's not my way.  I want it my way."

4    **THE COURT:**  He is narcissistic.  Because every time

5  he wants or he has the right to a payment it's going to be made

6  even though there's a right existing in favor of other parties,

7  including Mr. Roskind and his expense report.

8    **MR. JOHNSTON:**  My client had expenses too, your

9  Honor.  There wasn't the money in the account to pay them.

10    **THE COURT:**  You bet he did.

11    Then why didn't he offer to make the loan equal to

12  Mr. Roskind so that they could be paid?

13    **MR. JOHNSTON:**  I could've asked him that question on

14  the stand if I was given the opportunity.

15    **THE COURT:**  Well, why didn't he offer that Roskind's

16  expenses would be paid before his right to the $11,000 of his

17  share of the consulting fee?

18    **MR. JOHNSTON:**  Because the consulting fees per the

19  agreement of the parties and their prior practice was to pass

20  through the company.  It wasn't to cover company expenses.

21    **THE COURT:**  I think you've given me everything that I

22  need and everything that you should be permitted to give.  I

23  got the whole picture.  And I think I'm ready to render

24  judgment unless Mr. -- I haven't solicited Mr. Jean's input.

25    Unless you object, Mr. Jean, based upon appellate

1   problems with my entering judgment at this time partially --

2          **MR. JEAN:**  The only thing I would add, your Honor, is

3   that we had designated in the pretrial -- well let me -- we had

4   designated in the pretrial order the deposition of Mr. Emigh

5   and certain sections of it.  And I have the original

6   deposition; so I would like that to be part of the record as

7   well.

8          **THE COURT:**  Very good.  With any appropriate counter

9   designations as well.

10          **MR. JOHNSTON:**  I would like to then introduce Mr.

11   Roskind's deposition testimony into the record.

12          **THE COURT:**  I think that's appropriate.  Both

13   depositions should be admitted in full.

14      **(The depositions of Mr. Roskind and Mr. Emigh were**

15   **received in evidence)**

16          **MR. JOHNSTON:**  Your Honor, I would like to continue

17   on one point in terms of --

18          **THE COURT:**  Offer of proof.

19          **MR. JOHNSTON:**  On the offer of proof.

20          **THE COURT:**  On dissolution issue not --

21          **MR. JOHNSTON:**  Well, on the dissolution issue --

22          **THE COURT:**  Because we need to get to the issue of

23   how to divide it.

24          **MR. JOHNSTON:**  But there is the issue in terms of

25   dissolution.  If the Court finds dissolution warranted, what

1    next?  And I believe you are entitled to put on evidence as to

2    what then is the remedy.

3             **THE COURT:**  Let's get to that.  Let's address that

4    directly.

5             Here's my proposal.  I think what I'm permitted to do

6    -- which is the failsafe.  It's the backdrop.  It's the dead-

7    end -- is a judicially ordered and/or supervised or conducted

8    sale.  And that's what I'm going to order with the parameters

9    and methodology that I'm going to suggest.  But I'm also going

10   to suggest that I don't enter that order for 10 days, 15 days

11   so that the parties can consult on a better, more equitable way

12   to either divide or sale the properties.

13            The way I think that this should happen if the

14   parties cannot agree and what the statute permits and equity

15   law permits is a court-ordered sale.  It wouldn't be a fire

16   sale.  It would be -- might take over six months time.  And it

17   would be on the sufficient publicity.  That is publication at

18   least in the Wall Street Journal, some local papers, but more

19   importantly trade journals, also direct mailings to those large

20   scale software companies or browser companies which would have

21   an interest in these types of intellectual property; with the

22   opportunity to present for the Court's consideration private

23   sales prior to the auction sale; and then finally at the end of

24   a certain period, a court-conducted sale unless the parties

25   agreed on an appropriate -- somebody other than the Court whose

1    obviously not always the best conductor of a sale.

2          At such a sale, I would enter -- because there's the

3    prospect of the two sides, of course, bidding for some of these

4    items.  And we would need an early discussion about whether it

5    would be a bulk sale or whether we -- and how we would divide

6    up the package of intellectual properties into separate

7    packages for separate sale.  And the latter probably makes more

8    sense.

9          So contemplating that and contemplating that one side

10   or the other might be interested in bidding for those packages,

11   I think I would have to allow a credit -- credit bids.  And the

12   Court would declare here at the conclusion of this trial what

13   debts are owed from the entity to each of the respective

14   parties so that they would know the right to credit bid.

15         Now, if I let you use a credit bid, of course, to

16   purchase an asset, that presents a problem of fraud on third-

17   party creditors.  So I couldn't allow you to in essence pay off

18   the debt to one side or the other by a strictly credit bid.

19   Therefore, there would probably have to be a provision that

20   anybody making a credit bid before they could bid a single

21   dollar of their own credit would have to bid cash sufficient to

22   pay some portion and/or all of the debts owed to third parties

23   rather than these parties.

24         **MR. JEAN:**  Your Honor --

25         **MR. JOHNSTON:**  I don't even know if there is third

 1  party --

 2          **MR. JEAN:**  Yeah.  I don't --

 3          **MR. JOHNSTON:**  -- creditors.

 4          **MR. JEAN:**  Yeah.  I was going to say the same thing.

 5  I think -- I don't believe there are third-party creditors.

 6          **THE COURT:**  Do we have attorneys who are third-party

 7  debts?

 8          **MR. JEAN:**  No.

 9          **MR. JOHNSTON:**  The attorneys who have invoiced

10  payment have been --

11          **THE COURT:**  We don't have any third-party debt?

12          **MR. JEAN:**  Oh.

13          **MR. JOHNSTON:**  Yes, there is a third-party issue.

14  And the issue is and the testimony from Mr. Emigh would be that

15  Ms. Yi (phonetic) was going to be entitled to one percent of

16  the profits of the company for which -- in exchange for the

17  services she provided.

18          **THE COURT:**  We would certainly let you present

19  evidence of that.  Again, you've got the same problem.  No

20  agreement with her, right?

21          **MR. JOHNSTON:**  There's no written -- is there --

22          **THE COURT:**  Mr. Emigh testified she's getting

23  compensated.

24          **MR. JOHNSTON:**  That is correct.

25          **THE COURT:**  She's still his live-in companion?

1          **MR. JOHNSTON:**  They are still in a relationship, your

2   Honor.

3          **THE COURT:**  And you're not going to present me with

4   any written document or agreement of this entity that says you

5   have the right to X percent of the profits?

6          **MR. JOHNSTON:**  I'm not aware of any.

7          **THE COURT:**  Okay.  So, obviously, she would have to

8   have the opportunity to present claim or you to put on evidence

9   that there is a third-party creditor out there.  And if I so

10  concluded, then, of course, any dollar -- any credit bids would

11  have to be preceded by a sufficient cash bid to pay off third-

12  party creditors; so we don't affect a fraud on third-party

13  creditors.

14         And then the parties would have the right to credit

15  bid their credits.  And then the only potential problem then is

16  if we don't have a full in bidding of all of the credits owed,

17  we would have to have sufficient cash in the bidding process to

18  pay off the remaining debt due to one side or the other or to

19  both.

20         So those are -- that's the potential.  That's the way

21  I would conduct this sale, fail safe, backdrop.  What I'm

22  proposing, however, and is number one, your arguments.  Let's

23  get to the core of it.

24         What's the fairest way to realize the highest value

25  for these assets should we sell them or better yet should we

1  divide them?  And if we divide with them, which of course makes

2  the most sense because as both sides agree these -- it's hard

3  to value these assets, even under the suggestion that Mr.

4  Roskind's made of a self valuation system and a selection for

5  that valuation which would choose the highest value.

6          Nevertheless, there ought to be input.  If we have a

7  division, what's the best way to divide so that we realize the

8  highest value?  And if we do a division, how do we get -- how

9  do we apportion the liabilities and/or get sufficient cash to

10 pay off the liabilities to both sides for their expense report

11 reimbursements and loans, etcetera?

12         And, finally, if you can't reach agreement then,

13 "Okay, Court, do what you have to do.  And the only thing

14 you're authorized to do in the absence of agreement -- because

15 there's certainly no agreement, nor did Mr. Jean present

16 agreement that Mr. Roskind's potential offers of various

17 equitable splits was ever agreed to.

18         **MR. JEAN:**  That's true.

19         **THE COURT:**  There are no agreements to that effect,

20 and I'm glad he didn't try to try to present it as fiat

21 accompli.  So it's clear that in the absence of such agreement,

22 the only thing the Court really can do is order a sale.

23         I'm assuming that both sides probably don't want

24 that.  And, therefore, you would be motivated to work out the

25 best way to do a division subject to getting enough cash or to

1    pay off the debts and/or an agreement as to how to apportion

2    the debts.

3            **MR. JOHNSTON:**  Your honor, can I respond just

4    briefly?

5            I believe the Court can fashion a remedy other than a

6    public sale.

7            **THE COURT:**  I think I can.

8            **MR. JOHNSTON:**  As in terms of different manners and

9    if the Court -- I mean there're numerous ways to overcome the

10   issue as to -- I think the biggest fear upon and what the

11   evidence what we were going to show is and part of the case was

12   if you have -- and I'll just take an easy number -- 10 patent

13   applications or let's say 10 patents.  Let's say they all

14   result in patents.

15           **THE COURT:**  Start back a little bit earlier.

16           Do you agree that there is a subject matter grouping

17   of these various patents?

18           **MR. JOHNSTON:**  I believe loosely, yes.  There's some

19   in the same areas.

20           **THE COURT:**  And is there -- does it not -- does it

21   make sense or does it not make sense to group them thus?

22           And raising some of the issues that I see, because,

23   you know, in despite of obviously what the parties think that I

24   have no knowledge, I have knowledge.  I've handled patent

25   lawsuits, and I've heard the disputes.  I've heard the disputes

1    over claims, and I've interpreted claims.

2         So the biggest problem that you encounter if you

3    divide a common grouping between the two sides is the

4    subsequent claim in litigation of obviousness, the subsequent

5    claim in litigation that that patent was just a building upon

6    my patent.  If you don't divide them along clear demarcated

7    lines of subject matter, then you're just planning for future

8    litigation between yourselves.

9         So raising those kinds of issues, I ask again is

10   there subject matter grouping here that makes sense, or are all

11   of these stand alone, separate kind of patents?

12        **MR. JOHNSTON:**  Your honor, you know, I don't think I

13   can even answer that question and be accurate.

14        What I do know is that I know some of the patent

15   applications are in the same area, but I don't know how closely

16   related in that.

17        **THE COURT:**  Okay.

18        **MR. JOHNSTON:**  For example, I know there's anti-

19   phishing technology, but I don't know if it all -- I just -- I

20   don't --

21        **THE COURT:**  That's something you need to discuss then

22   with your clients, potentially with experts who would help you,

23   or just with your clients and then between yourselves and

24   finally with the Court.  Because it sure makes sense, unless

25   we're going to do this as a bulk sale to sell -- if we're going

1  to sell them individually, we're potentially creating real

2  future litigation problems between these parties and with any

3  other third parties who buy them.

4         **MR. JEAN:**  Your Honor, may I speak to a little of

5  that?

6         **THE COURT:**  To the background and then I'll let

7  counsel go on with his -- he wanted to present some potential

8  alternatives.

9         **MR. JEAN:**  Just first we do believe that there are

10 subject matter groupings.  They can be ascertained.  And, in

11 fact, without going into the substance of everything about the

12 mediation, one of the things that was done in that is we set up

13 a protocol for establishing or tried to get an agreement that

14 after everyone -- as to what the exact groupings are.

15        The other concern that I have -- and I hope and

16 believe that we may be able to find a way of dividing the

17 patents up and, you know, separating out the groupings.

18        **THE COURT:**  One other suggestion or comment.  You

19 know, if it's really true that a particular grouping is not so

20 much the product of collaboration but is really more one side

21 or the other's, in other words if it really was one side or the

22 other's invention or more importantly one side or the other's

23 drafting and history of prosecution of the patent application

24 and it makes some sense to let that side acquire or take,

25 subject to a proper valuation, and the final limitation that

1    they each get 50/50.

2            **MR. JEAN:**  The only other concern that I have and we

3    don't -- and there hasn't been discovery about any patents that

4    either party has obtained since they stopped really working

5    together is if there was going to be this kind of a division

6    that we probably would need to have anyone would was not taking

7    a grouping warrant that he doesn't hold some blocking patent

8    that he has subsequently submitted.  I mean that's what makes

9    this whole process so difficult.

10           **THE COURT:**  That would be automatic future

11   litigation.

12           **MR. JEAN:**  Right.  Right.

13           So I think the Court's --

14           **THE COURT:**  That makes some sense too.

15           Let me hear counsel's representation.  We're not

16   going to resolve it today, but representation of potential

17   alternatives and what makes sense how -- what we can do short

18   of a court-ordered sale.

19           **MR. JOHNSTON:**  Well, I think one of the issues that

20   we wanted to present evidence on and were presenting was, you

21   know, if you have ten patents one might generate all the

22   revenue, and the other nine may not.  So if you divide them

23   five and five, then one member of the LLC would get all the

24   revenue that the assets generate to the exclusion of the other.

25   That can't be reconciled with Chapter 86, which says, you know,

1    you've got to distribute the assets in a manner apportionate to

2    what their share of the profits would be.

3            **THE COURT:**  I agree.  And that's a problem.  So what

4    are your alternatives?  One is to take evidence and value the

5    patents.

6            **MR. JOHNSTON:**  And there's no --

7            **THE COURT:**  But you know there you really have a

8    problem; don't you?  Because, again, you're talking to a

9    layperson.  What are you going to do?  Are you going to put on

10   experts?  Are you going to put on the parties and say this

11   one's worth 500 grand?  This one is worth the expenses to

12   produce a patent.  This one's only worth 20 grand at best.

13   It's whole future income stream.  And then expect the Court to

14   make a conclusion.

15           I mean if you both agree if both -- if all of the

16   evidence is pretty consistent with that, that makes sense.  But

17   if the evidence is really conflicting and you have witnesses

18   who same that one's worth 20 million bucks, that one's worth

19   only 20 grand, and they just disagree over the same patent

20   application; how do you expect the Court to reach a fair

21   conclusion on that question?

22           **MR. JOHNSTON:**  Your Honor, that was part of the

23   defense in this case, that there was no way for this Court to

24   reach that decision.

25           **THE COURT:**  But it's not a fair defense, because what

1    the Court has to do if it can't equitably divide is sell.

2              **MR. JOHNSTON:**  Your Honor, I disagree under the law

3    on that.  Because the Court could -- does not have to sell.

4    There are other things that could be done.  For example,

5    I mean --

6              **THE COURT:**  Give management to one side and let

7    them --

8              **MR. JOHNSTON:**  No.

9              **THE COURT:**  -- go on managing what can't be divided?

10   No.

11             **MR. JOHNSTON:**  Well, if you, your Honor --

12             **THE COURT:**  Give it to a receiver.  I would have that

13   alternative.  "You know what?  We're going to let this company

14   continue, but it's not going to be under Mr. Emigh's control.

15   It's not going to be under Mr. -- it's going to be under a

16   receiver."  That's an alternative.

17             **MR. JOHNSTON:**  There are --

18             **THE COURT:**  The Court can do that.

19             **MR. JOHNSTON:**  There are alternatives.

20             **THE COURT:**  And it would cost you both big bucks.

21             **MR. JOHNSTON:**  With third party -- there's that

22   alternative.

23             There's another alternative, your Honor.  And this is

24   -- I want to throw it out there.  It's not something that

25   I'm -- that my client says, "Yes, this is -- it's just

1    different ways when you think about it.  Since we're talking

2    about if you divide them, does it exclude the economic upside

3    of the other?  You could theoretically -- and I'm just talking

4    of all the different possibilities.  If you have the ten

5    patents that we take the example of, if you put five into one

6    LLC and five into another LLC, with one LLC being the Jim

7    Roskind LLC as the managing member with Mr. Emigh as the member

8    then -- and vice versa, and the reason you do that is then Mr.

9    Roskind has an economic interest to maximize the value of his

10   portfolio, the part he gets.  And Mr. Emigh gets a benefit from

11   it.

12           THE COURT:  That's certainly an alternative.

13           MR. JOHNSTON:  And the same thing with Mr. Emigh.  He

14   certainly --

15           THE COURT:  We'd want to make sure that there isn't

16   future litigation built in, but that is a potential

17   alternative.

18           MR. JOHNSTON:  But there are different ways to do

19   this so that you do it in a manner to resolve --

20           THE COURT:  Right.

21           MR. JOHNSTON:  -- what the Court has found as

22   deadlock, but not to exclude the economic upside.

23           THE COURT:  So that we have it complete, we need to

24   put some of the other alternatives on the table too.

25           One is what the parties talked about, which I

1    certainly could not find was an agreement.  And that is one

2    party make the divisions, and the other party select which

3    division they want.

4            **MR. JOHNSTON:**  Your Honor, you could --

5            **THE COURT:**  Another alternative is the one suggested

6    by Mr. Roskind.  We agree on the packages, a number of

7    different packages, primarily along the lines of subject matter

8    and without overlapping or blocking -- subsequent blocking

9    patent applications that would create litigation.  We agree on

10   the packages and then -- and would also agree on a range of

11   values.

12           And the Court would have to order a range so that we

13   don't get really far out bids.  But then we proceed as he

14   suggested to let the parties privately bid, closed secret bid.

15   And that bidder prevails; they take it.  And as long as we

16   equal -- get roughly equal on both sides total bids -- in other

17   words, we would eliminate their higher bid on those last items

18   for which the difference is very small.

19           We would give credit to the higher bid.  In those

20   cases where they really have the significant, substantial

21   higher bid, we would give -- assuming that they're the higher

22   bidder across the board, we would not give credit to their bid.

23   We would take the lower bid when we reached the point of about

24   50/50 division.  So that's an alternative too.

25           Another alternative, of course a very expensive one,

1  is to have an outside appraiser.  The Court has the authority

2  under the Civil Rules to do that.  I can appoint a master who

3  could appraise these.  But, again, that would be as much guess

4  work as my guess.  You know, I could appoint a patent lawyer I

5  assume or an intellectual property owner to appraise these as a

6  special master.  So that's an alternative too.

7          What are some of the other alternatives?

8          **MR. JOHNSTON:**  Mr. Roskind could buy out Mr. Emigh,

9  or Mr. Emigh could buy out Mr. Roskind.  There's different ways

10  to do that.

11          **THE COURT:**  That's true.  Including an offer one side

12  gets to specify the buyout price, and the other side gets to

13  say whether it's a put or a call.

14          **MR. JOHNSTON:**  Having been through these before, your

15  Honor, there's other alternatives.  I think--

16          **THE COURT:**  There are.

17          **MR. JOHNSTON:**  -- there are things in which the Court

18  could theoretically give a number -- and I don't know if this

19  is what the Court was already talking about -- almost like fake

20  money to each side to bid on assets.

21          **THE COURT:**  Right.  Okay.

22          **MR. JOHNSTON:**  There's a host of alternatives.

23          **THE COURT:**  I think the way that I had in mind is

24  really the best.  The ten days is too short I can see because

25  of the range of alternatives and the sophistication and

 1   complexity of them.

 2         I think what I need to say is -- what I'm going to do

 3   is I'm going to do a court-ordered sale and conducted sale.

 4   You may agree to somebody else conducting the sale.  And I

 5   certainly want your input on how to publish the sale and the

 6   time period and the reasonableness for the sale.

 7         I even want your input on a range of acceptable bids

 8   for the sale.  In other words, if we don't achieve X bid for

 9   this asset, we won't sell it.  But the backstop is the Court

10   will order a sale.  And I'll do it after X days.

11         I'm thinking now 30 days, 60 days.  Enough time to

12   give you the options.  I think both of you know that that's the

13   worst scenario.  And I recognize it's the worst scenario,

14   because these are infant assets.  Right.  We all recognize

15   that.

16         And so I think I need to give you plenty of time to

17   work out and in the absence of agreement offer to the Court

18   argument why we shouldn't do the court-ordered sale.  "Here's

19   the alternative I'm proposing.  I understand it's not agreed to

20   but, Judge, equitably this is the sale that makes sense or the

21   division that makes sense."

22         **MR. JOHNSTON:**  Or the division.

23         **THE COURT:**  And in that regard if you have evidence

24   to present, I should take it.

25         **MR. JOHNSTON:**  And, your Honor, my understanding was

1    that we were going with the denial of the motion to bifurcate.

2    That was going to be an issue in this trial.

3              **THE COURT:**  It is.

4              **MR. JOHNSTON:**  I think that's one of the other

5    reasons why we're here.

6              **THE COURT:**  It is, and it was.  But nobody has

7    designated any expert.

8              **MR. JOHNSTON:**  Which I have to go back as to when the

9    Court characterizes our defense and a claim for dissolution as

10   frivolous when the plaintiff has not offered the expert to

11   provide the Court guidance on the method of dissolution.  The

12   defense respectfully is not frivolous, because the plaintiff

13   would not show how to divide equitably.

14             **THE COURT:**  And I disagreed with you.

15             **MR. JOHNSTON:**  I understand.

16             **THE COURT:**  And I failed to bifurcate, because,

17   obviously, what I was telling you, hopefully obviously, is that

18   that's not a defense.  It's not a defense.  The fact that there

19   are less favorable alternative remedies is not a defense to the

20   dissolution action.  That's what I was telling you.

21             **MR. JOHNSTON:**  I understand that, but I want my

22   position clear that what our position was -- I understand that

23   the less favorable remedies --

24             **THE COURT:**  But you want that issue litigated.

25             **MR. JOHNSTON:**  Exactly.  That --

1      **THE COURT:**  And I'm going to give you the absolute

2  right to do that.

3      **MR. JOHNSTON:**  Okay.

4      **THE COURT:**  I had anticipated really it was just

5  argument for all of the reasons I've already said, including

6  the argument that, you know, I'm going to listen to an expert

7  who will value.  I'm willing to do that especially if both

8  sides agree.  But I told you the problems with that.

9      I've had, including in the bankruptcy experience for

10  20 years and five years in the receivership and patent

11  litigation in front of me, I have plenty of experience of

12  knowing the problem of having an appraiser value the asset in

13  any context whether lift of stay, whether dissolution, whether

14  forced sale from one side to the other.  And so that's what I

15  was trying to convey.

16      And you're going to recognize that too although I'm

17  not cutting you off.  If you have evidence to present in that

18  regard, "Judge, you can't sell this asset, this particular

19  asset for less than $10 million, and here's why."  I'm going to

20  take your evidence.

21      And I'm going to take your argument even though the

22  other side disagrees.  "It can be sold, and it can be sold for

23  a thousand bucks."  I'm going to take your evidence that bears

24  on the equitable question.

25      **MR. JOHNSTON:**  So my understanding is we're going to

1    have 60 days to potentially reach some sort of an agreement.

2              THE COURT:  Agreement.

3              MR. JOHNSTON:  And then we're going to come back --

4              THE COURT:  Or -- yeah.  Or come back and say,

5    "Judge, we almost agree, but here's the major sticking points.

6    And now we need your equitable decision."  And we have argument

7    and/or we have evidence.

8              MR. JOHNSTON:  Understood.

9              THE COURT:  I think that makes sense.

10             Okay.  Do you need -- while we're in -- I'm certainly

11   not going to stay this process.  But while we're in this

12   process, do you need a certification or time period to seek

13   appeal on the primary judgment and finding?

14             MR. JOHNSTON:  Well, if the Court is going to issue -

15   - I guess it would be on the first claim for relief for

16   dissolution under 86.495.  Maybe I should make a request for a

17   54(b) determination.

18             THE COURT:  I would honor that.  I'm certainly not

19   going to stay the judgment of dissolution, but I would honor

20   that so that you can take an immediate appeal if you need to.

21             MR. JOHNSTON:  Well, I guess my understanding -- my

22   confusion on that, your Honor, if you don't --

23             THE COURT:  Maybe you ought to think about that,

24   because if you get a --

25             MR. JOHNSTON:  If you don't stay that decision --

1          **THE COURT:**  -- certification then, of course, you can

2    appeal later.

3          **MR. JOHNSTON:**  Right.

4          **THE COURT:**  And your whole desire to appeal may be

5    mooted on the outcome of the division.  So you need to make a

6    decision.

7          Do you want a certification now, or do you want for

8    now or forever be barred from taking your appeal, or do you

9    want the appeal right left?

10         **MR. JOHNSTON:**  I think those are issues I need to

11   discuss with my client.

12         **THE COURT:**  You do, yeah.

13         **MR. JOHNSTON:**  I think there are some rule issues I

14   need to look at.

15         **THE COURT:**  Right.

16         **MR. JOHNSTON:**  Because if the parties reach an

17   agreement -- but I don't want to be foreclosed from appealing

18   as appropriate the Court's ruling on dissolution.

19         **THE COURT:**  I agree.

20         **MR. JOHNSTON:**  So maybe it might be proper for me to

21   wait till a final determination and appeal that.

22         **THE COURT:**  Within the next 10 days you tell me

23   whether you want a certification or not.  If you don't, then,

24   of course, you're preserving the right to appeal when we have a

25   final judgment.  You can appeal all these issues including the

43

1   division and/or the sale.

2         **MR. JOHNSTON:**  And I have a concern, your Honor,

3   about an order from a court that's determined final dissolving

4   -- granting dissolution.  What happens to the corporate status

5   at that point in time?

6         **THE COURT:**  Yeah.  This isn't final.  I'm giving

7   partial judgment.  I'm telling you that I intend to enter the

8   judgment of dissolution.

9         This isn't final for purposes of cutting off your

10  appeal time or appeal right.  And, obviously, there's going to

11  be an interim period here.  There has to be ongoing management.

12  There has to be ongoing continuation of the prosecution of the

13  patents.  And there has to be ongoing preservation of the

14  status of the entity.

15        **MR. JOHNSTON:**  May I make the suggestion, your Honor,

16  that the order of dissolution --

17        **THE COURT:**  Yeah.

18        **MR. JOHNSTON:**  -- does not get entered until the

19  expiration of the 60 day period --

20        **THE COURT:**  Sure.

21        **MR. JOHNSTON:**  -- which we're going to be talking.

22        **THE COURT:**  That suggestion makes a lot of sense.

23        **MR. JEAN:**  I think that to have the entity dissolved

24  is going to present -- you know while we are still going on

25  with this process might be more complicated.

1          **THE COURT:**  Right.

2          **MR. JEAN:**  So I think that would be -- I'm not sure

3   that we need 60 days to --

4          **THE COURT:**   How long do you need?

5          You need an initial period to sit down and kick each

6   other's toes and make persuasive arguments to each other and

7   then to prepare for arguments to the Court.

8          **MR. JEAN:**  I would think, your Honor, that if we

9   approximately -- oh, I've got a trial exactly 30 days.  But

10  maybe 40 days out if we had a hearing.

11         **THE COURT:**  You're both fresh in your memory, you

12  ought to do this in the next ten days.

13         **MR. JEAN:**  Well, no.  My idea is that we're going to

14  sit down and try and work it out soon, like perhaps today.

15         **THE COURT:**  Right.  Well, let's say 30 days before

16  you return.  Let me bring you back for -- I'm not saying I'm

17  going to order the sale at the end of 30 days, but I'll set a

18  hearing right now for consideration of the alternatives and

19  taking of initial arguments on --

20         **MR. JEAN:**  The reason I said -- your Honor, the

21  reason I said I suddenly changed from 30 to 40 was only because

22  I am going to be in trial exactly 30 days from today.

23         **THE COURT:**  Thirty days hence.  So --

24         **MR. JEAN:**  So that's why --

25         **THE COURT:**  So for everybody's benefit, including the

45

1    interim management question, we ought to try to get this

2    resolved as quickly as possible.

3            **MR. JEAN:**  Well, then perhaps maybe we should go a

4    little sooner.  Maybe 20 days out?

5            **THE COURT:**  Let's do -- I'll give you a hearing in 20

6    days.  It's not the final hearing.  But it's 20 days.

7            In other words, in the next ten days, you have to sit

8    down and kick this around and decide on what real areas of

9    dispute you have.  Maybe you really have no dispute.  And I

10   suggest to you too a good recommendation is that you privately

11   take from your own client potential valuations and bid prices

12   with the ability to disclose that only to a third party who

13   won't disclose it to each side or only to disclose it between

14   counsel.  So some way to figure out do we really have a

15   dispute.

16           **MR. JOHNSTON:**  Well, I would say based upon our

17   experience at the mediation --

18           **THE COURT:**  Mediation that you do.

19           **MR. JOHNSTON:**  -- that we do.

20           **THE COURT:**  Yeah.

21           **MR. JOHNSTON:**  I think it's just -- the biggest issue

22   is how do you put your arms around a division when you're

23   looking at something and say, "Well, you know that might be a

24   big winner."

25           **THE COURT:**  Right.

46

1          **MR. JOHNSTON:**  And it's difficult.

2          **THE COURT:**  And it's so closely tied to the side or

3    the other or both that has the greatest motivation to prosecute

4    a particular patent or patent group.

5          **MR. JOHNSTON:**  Right.

6          **THE COURT:**  It's so closely tied to that question.

7    And Mr. Emigh said it exactly.  You know, and if he has the

8    greater motivation, he's obviously going to put a higher value

9    and wants to receive that one in which he has the higher

10   motivation.  That makes sense to me.

11         **MR. JOHNSTON:**  I also believe, your Honor, there is

12   some emotional attachment to the inventions that someone put in

13   and put a lot of time and work on, both for Mr. Roskind and Mr.

14   Emigh.  And they don't want to lose it.

15         **THE COURT:**  There sure is in this kind of case.

16         **MR. JEAN:**  Your Honor, if I may suggest one other

17   thing, that if we could submit perhaps a couple days before the

18   hearing our suggestions and thoughts as to both any protocols

19   for sale and also what we think are the equitable divisions

20   that might work.

21         **THE COURT:**  Right.  The agreed points.  I'm not going

22   to put you to the burden of spending a lot of lawyer time

23   drafting.  But it probably would be helpful, even if it's a

24   point bulletin statement of position or something brief --

25         **MR. JEAN:**  Right.  A few days before.

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **THE COURT:**  -- that lists the agreed method of sale

2    or the agreed division method and the sticking points and then

3    proceed to argue or tell me you need evidence.

4       **(Pause)**

5          **MR. JOHNSTON:**  Your Honor, just so I'm clear we're

6    looking at agreed methods potentially?

7          **THE COURT:**  Right.

8          **MR. JOHNSTON:**  Either sale or division or process?

9          **THE COURT:**  Right.  Yeah.  And/or a discussion of

10   procedure, further hearings or what to resolve the differences,

11   the un-agreed alternatives.  Okay.

12         **MR. JEAN:**  I have one more question for

13   clarification, your Honor.  When we come back in, you know,

14   approximately three weeks, is that -- would you want to as well

15   hear any testimony from either the parties regarding some of

16   these issues or I don't know.  I just want to clarify one way

17   or the other if we're --

18         **THE COURT:**  If you agree, you know, I'll make time

19   for you.  If you agree, "Now's the time to put on the evidence.

20   And we have -- you know, we have five hours worth of evidence;

21   Judge, fit it in."

22         **MR. JEAN:**  So it will be non-evidentiary unless

23   counsel agree?

24         **THE COURT:**  Right.  And unless you forewarn me,

25   because I'm going to put you on an argument calendar.

 1          **MR. JEAN:**  All right.

 2          **THE COURT:**  So if you do want evidence it may trail

 3   into the next trial day for example.

 4          **MR. JEAN:**  But I do think that the discussion of this

 5   is going to take more than an hour probably at that hearing.

 6          **THE COURT:**  Probably.

 7          **MR. JEAN:**  Yeah.

 8          **THE COURT:**  Right.  Let me say finally, I apologize

 9   to you for the findings I felt I had to make.  I just felt like

10   I had to bring this to a close.  It was just going in a

11   nonsense direction.

12          Again, this isn't justification to the Appellate

13   Court.  Because, obviously, counsel may want to tell the

14   Appellate Court Judge Jones was just crazy and/or biased.  But

15   I'm making a personal apology.

16          I apologize for the use of the terms, but I felt that

17   I had to, to bring the proceeding to a halt and get it headed

18   in the right direction.  So I apologize to that on a personal

19   level.

20          **MR. JOHNSTON:**  And, your Honor, I must state to you

21   that, you know, I disagree with the stance.

22          **THE COURT:**  Absolutely.

23          **MR. JOHNSTON:**  And I understand your view.  I feel

24   that we've been severely prejudiced by not being able to put on

25   the evidence.  I understand the Court's ruling.  I respect the

49

1    Court.  I don't agree with it.

2            At the same time, it does disturb me that the terms

3    frivolous and narcissistic were what were used by the Court

4    from the bench after 45 minutes of testimony.  And which by the

5    last discussion that we just had the number of complicated

6    issues that are involved in this case and any claim for

7    dissolution, we certainly had the right to be in this court

8    arguing pros and cons of dissolution.  And to say that

9    arguing --

10           **THE COURT:**  For sure.

11           **MR. JOHNSTON:**  -- that was frivolous, I believe is

12   just --

13           **THE COURT:**  No.  It was just the --

14           **MR. JOHNSTON:**  -- unfair.

15           **THE COURT:**  The only thing that I really labeled

16   frivolous in my mind and hopefully on the record was the

17   defense of a -- what I really see as a forfeiture provision, a

18   vesting schedule.  That was all that I was referring to.

19           But, again, I apologize.  And, of course, if I'm

20   wrong the Appellate Court can pull me up short.

21           **MR. JOHNSTON:**  And I also want clear on the record

22   that that was not the entirety of the basis of the defense.

23           **THE COURT:**  No.  I fully appreciate that.

24           **MR. JOHNSTON:**  Okay.

25           **THE COURT:**  Including the equitable alternatives.

1    Assuming the Court is going to order dissolution, what are the

2    equitable alternatives?  There's certainly no frivolousness to

3    a defense there at all.

4             **MR. JOHNSTON:**  And that was one of the primary

5    arguments we were making in this case, your Honor.

6             **THE COURT:**  Right.

7             **MR. JOHNSTON:**  And not just that there was this

8    agreed upon vesting schedule.  Even if the Court found that

9    that wasn't there, we had 50/50 ownership and then what is the

10   issue there.

11            **THE COURT:**  And can it be divided?

12            **MR. JOHNSTON:**  Exactly, your Honor.

13            **THE COURT:**  Is it possible to divide it?

14            **MR. JOHNSTON:**  And so I apologize --

15            **THE COURT:**  Those are non-frivolous defenses I fully

16   acknowledge.  And, again, I apologize to you for feeling the

17   necessity to use those terms.

18            **MR. JOHNSTON:**  And I take very seriously the Court's

19   characterization of potential arguments in this case as

20   frivolous.

21            **THE COURT:**  I do apologize.

22            **MR. JOHNSTON:**  Thank you, your Honor.

23            **THE COURT:**  Thank you.  Thank you, counsel.

24            Let's -- give us a date and time for return please.

25            **THE CLERK:**  Your Honor, July 7th at ten o'clock a.m.

1          **THE COURT:**  Okay.  Okay.  Very good.  Thank you.

2          **MR. JEAN:**  Thank you.

3          **MR. JOHNSTON:**  Thank you, your Honor.

4          **THE CLERK:**  All rise.

5      **(This proceeding was adjourned at 11:14 a.m.)**

6
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    June 23, 2008

            Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*